**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ERIC MUNCHEL,
*Address filed under Seal*
Plaintiff,

-against-

UNITED STATES OF AMERICA,
*c/o U.S. Attorney's Office, District of Columbia,*
*950 Pennsylvania Avenue, NW Washington, DC 20530*

MERRICK GARLAND, individually,
*c/o Arnold & Porter 601 Massachusetts Ave, NW*
*Washington, DC 20001-3743*

MATTHEW GRAVES, individually,
*c/o Winston Taylor LLP, 1901 L Street NW,*
*Washington, DC 20036*

DONALD W. WASHINGTON, individually,
*Jones Walker LLP, Suite 1600, 600 Jefferson St,*
*Lafayette, LA 70501*

KATHLEEN LANDERKIN, individually,
*Warden, Baltimore Pre-Trial Complex,*
*300 E. Madison Street, Baltimore, MD 21202*

ROBERT ANTHONY DIXON, individually,
*U.S. Marshals Service, Superior Court of D.C.,*
*Moultrie Courthouse, 500 Indiana Avenue NW,*
*Washington, DC 20001*

and

JOHN DOES 1-25, individually,
*c/o Federal Detention Center Philadelphia, 700 Arch*
*Street, Philadelphia, PA 19106*
Defendants.

Civil Action No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff ERIC MUNCHEL (hereinafter, "Plaintiff" or "Munchel") by and through his attorneys, Raiser, Kenniff & Lonstein, P.C. brings this Complaint and respectfully alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for damages arising from Defendants' violations of Plaintiff's rights under the United States Constitution, as well as for tortious conduct actionable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

2. Plaintiff was targeted, arrested, prosecuted, and punished because of his constitutionally protected expressive and associational activity as a member of the protesters who gathered on the U.S. Capitol on January 6th, 2021 (hereinafter, the group of people prosecuted for their activities at or near the Capitol Building on January 6th, 2021, will be referred to as the "January 6th Defendants"). Defendants selectively and disproportionately exercised governmental authority against Plaintiff as part of a broader campaign directed at January 6th Defendants. Through retaliatory prosecution, discriminatory detention practices, deliberate indifference to Plaintiff's health and safety, and other unlawful conduct, Defendants violated Plaintiff's constitutional rights and caused severe physical, emotional, reputational, and economic injury.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5. Jurisdiction over Plaintiff's constitutional claims against individual federal officers is conferred by *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), and its progeny.

6. Jurisdiction over Plaintiff's claims against defendant UNITED STATES OF AMERICA (the "U.S. Government") is conferred by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the acts and omissions giving rise to Plaintiff's claims occurred in this District.

8. This Court has personal jurisdiction over defendant KATHLEEN LANDERKIN pursuant to the District of Columbia Code §§ 13-422 and 13-423(a)(3).

9. Plaintiff attempted to file administrative grievances to timely contest his mistreatment while incarcerated at the District of Columbia Department of Corrections (hereinafter, "D.C. Jail") but the documentation and grievances Plaintiff attempted to file were either destroyed, confiscated, lost, or simply not addressed.

10. In other words, Plaintiff exhausted all administrative remedies that were available to him. To the extent Defendants contend otherwise, the grievance system was unavailable because grievances were not processed, Plaintiff was not informed of appeal rights, grievances were resolved without meaningful review, and officials retaliated against Plaintiff for using the grievance system.

11. The failure to properly resolve grievances is a systemic issue. As was relayed to Camile Williams, Deputy Director of Programs and Supplementary Services within the D.C. Department of Corrections, by the United States Marshals Service on January 3, 2022, "the

prisoner grievance program continues to present challenges," including, but not limited to, a lack of timely, proper and/or sufficient responses.

12. On or about August 8, 2025, Plaintiff transmitted three administrative Notices of Claim to the United States Department of Justice ("DOJ") setting forth the factual basis for his claims and demanding a sum certain. More than six months elapsed without final denial.

13. As of the date of this Complaint, the United States failed to settle or issue a final denial of Plaintiff's claims within the statutory period. More than 180 days had elapsed, resulting in constructive exhaustion under 28 U.S.C. § 2675(a).

## PARTIES

14. Plaintiff is a United States citizen and resident of Davidson County, State of Tennessee.

15. Defendant UNITED STATES OF AMERICA is sued pursuant to the FTCA for tortious acts and omissions of federal employees acting within the scope of their employment.

16. Defendant MERRICK GARLAND ("Garland") is sued in his individual capacity for actions taken while serving as Attorney General of the United States.

17. Defendant MATTHEW M. GRAVES ("Graves") is sued in his individual capacity for actions taken while serving as United States Attorney for the District of Columbia.

18. Defendant DONALD W. WASHINGTON ("Marshal Washington") is sued in his individual capacity for actions taken while serving as the director of the United States Marshals Service ("USMS").

19. Defendant DEPUTY WARDEN KATHLEEN LANDERKIN ("Deputy Warden Landerkin") is sued in her individual capacity for actions taken while serving as the Deputy Warden of the D.C. Jail.

20. Defendant ROBERT ANTHONY DIXON ("Marshal Dixon") is sued in his individual capacity for actions taken while serving as the U.S. Marshal for the USMS for the Superior Court of the District of Columbia.

21. Defendants JOHN DOES 1-25, individually, include but are not limited to unknown agents, officers, employees, supervisors, policymakers, prosecutors, public-affairs personnel, and other officials of the United States Department of Justice, the United States Attorney's Office for the District of Columbia, and/or the Federal Bureau of Investigation who personally participated in, directed, approved, ratified, supervised, or knowingly permitted the investigative, public-facing, charging, prosecutorial, search, arrest, or other law-enforcement actions complained of herein.

## FACTUAL ALLEGATIONS

22. Prior to January 6th, 2021, Plaintiff lived an ordinary life as a hardworking member of his community in Tennessee, maintaining steady employment and supporting himself through honest work. Before the events giving rise to this action, Plaintiff had never been viewed by his community as a violent extremist, domestic terrorist, or threat to public safety.

23. On January 6th, 2021, a joint session of the United States Congress convened at approximately 1:00 p.m. to certify the Electoral College vote of the 2020 Presidential Election.

24. On that day, Plaintiff was present in Washington, D.C. to exercise his First Amendment rights by attending a political rally and protesting the certification of the Electoral College vote.

25. On January 10, 2021, Plaintiff's home was searched by the FBI. On January 11, 2021, shortly after learning about the search, Plaintiff self-surrendered.

26. Subsequently, Plaintiff was indicted on February 12, 2021. The criminal action proceeded in the United States District Court, District of Columbia, under Case No. 21-cr-118.

27. A final superseding indictment was entered on October 7, 2022. Plaintiff was charged with violation of:

a. 18 U.S.C. § 1512(k), Conspiracy to Commit Obstruction;

b. 18 U.S.C. §§ 1512(c)(2), Obstruction of an Official Proceeding and Aiding and Abetting;

c. 18 U.S.C. § 1752(a)(1), (b)(1)(A), Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon;

d. 18 U.S.C. § 1752(a)(2), (b)(1)(A), Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon;

e. 40 U.S.C. § 5104(e)(1)(A), Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings;

f. 40 U.S.C. § 5104(e)(2)(B), Entering and Remaining in the Gallery of Congress;

g. 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building;

h. 40 U.S.C. § 5104(e)(2)(G); Parading, Demonstrating, or Picketing in a Capitol Building.

28. On or around January 11, 2021, Plaintiff self-surrendered at his local FBI field office. Processed and detained in Davidson County Jail, he was subjected to solitary confinement in a special housing unit ("SHU") for almost three weeks because the Government had obtained an *ex parte* stay of a court order releasing him (the circumstances surrounding Plaintiff's detention are further set forth below).

29. Thereafter, Plaintiff was detained at the D.C. Jail for two months while he contested his pre-trial detention, which was ultimately found by the Court of Appeals, District of Columbia Circuit to be in violation of the Bail Reform Act. He was held in a quarantine pod for two weeks and endured “23/1” solitary confinement: twenty-three hours in confinement per one hour allotted for hygiene and limited activity (e.g., phone calls).

30. Once he was released from his pre-trial detention, Plaintiff fully complied with every condition imposed by the Court. He maintained employment, married, prepared to become a father, and remained a productive member of his community.

31. Plaintiff was convicted of several charges, including the charges of violating 18 U.S.C. § 1512, on or about April 18, 2023.

32. On September 8, 2023, Plaintiff was sentenced to 57 months for some of the charges and 6 months for other charges, with the sentences to run concurrently. Subsequent to his release from prison, Plaintiff was to undergo supervised release for 36 months.

33. Plaintiff served his sentence at FCI Yazoo.

34. While at FCI Yazoo, Plaintiff was subjected to inhumane conditions, including exposure to mold, poor sanitation, inedible food and improper nutrition, deprivation of hygiene services, denial of visitation rights including legal visitation, denial of prescribed medication to treat Plaintiff’s blood pressure.

35. While at FCI Yazoo, Plaintiff was housed in units with severe insulation problems and visible toxic mold, resulting in physical discomfort and increased health risks.

36. On June 28, 2024, the Supreme Court of the United States issued its decision in *Fischer v. United States*, 603 U.S. 480 (2024), substantially narrowing the scope of 18 U.S.C. § 1512(c)(2) and rejecting the expansive interpretation utilized in many January 6 prosecutions.

37. Plaintiff's convictions on 18 U.S.C. § 1512(c)(2) and § 1512(k) were vacated on or about December 20, 2024.

38. On January 22, 2025, following President Trump's pardon of many of the January 6th Defendants, the United States government moved to dismiss the indictment against Plaintiff. The motion was unopposed and duly granted.

**THE GOVERNMENT'S JANUARY 6 ENFORCEMENT CAMPAIGN**

39. Following January 6, 2021, the United States Department of Justice publicly announced that the investigation and prosecution of January 6th Defendants would constitute one of the largest criminal enforcement efforts in the history of the Department.

40. At all relevant times, Defendant Merrick Garland served as Attorney General of the United States and exercised supervisory authority over Department-wide policies concerning January 6th investigations and prosecutions.

41. At all relevant times, Defendant Matthew Graves served as United States Attorney for the District of Columbia and exercised supervisory authority over January 6th prosecutions within the District of Columbia.

42. Throughout their respective tenures, Garland and Graves repeatedly described January 6th prosecutions as among the Department's highest priorities and publicly emphasized the importance of those prosecutions in official statements, media appearances, congressional testimony, and Department of Justice communications.

43. Upon information and belief, Garland and Graves approved, implemented, supervised, ratified, or knowingly permitted investigative, charging, detention, plea-negotiation, sentencing, and appellate policies applicable to January 6th Defendants, including Plaintiff.

44. Upon information and belief, Garland and Graves approved or ratified the Department's widespread use of 18 U.S.C. § 1512(c)(2) despite knowing that the Department's interpretation materially expanded criminal liability, increased detention exposure, increased sentencing exposure, and substantially enhanced prosecutorial leverage.

45. Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

46. Plaintiff alleges that these policies subjected January 6th Defendants, including Plaintiff, to materially harsher investigative, charging, detention, and sentencing practices than similarly situated criminal defendants and had the effect, at least in part, of maximizing deterrent effect and public example-making.

**PLAINTIFF'S WRONGFUL PRETRIAL DETENTION**

47. Following Plaintiff's arrest, a United States Magistrate Judge in the Middle District of Tennessee conducted a full detention hearing pursuant to the Bail Reform Act. After considering Plaintiff's history and characteristics, the nature of the allegations, and the conditions available to reasonably assure community safety and Plaintiff's appearance, the court concluded that Plaintiff should be released pending trial subject to stringent conditions, including home confinement, GPS monitoring, supervision by Pretrial Services, and a prohibition on possessing firearms or dangerous weapons.

48. After the United States Magistrate Judge determined that Plaintiff was neither a flight risk nor a danger to the community and ordered his release under stringent conditions, the United States immediately sought review in the District of Columbia and obtained an *ex parte* stay of that release order.

49. As a result of the *ex parte* action of the United States, Plaintiff remained incarcerated for approximately three weeks despite the absence of any judicial finding that he posed a danger warranting continued detention. The Court of Appeals later described this sequence of events as "troubling," observing that Plaintiff remained detained pursuant to an *ex parte* stay even though the Government had failed to carry its burden before the magistrate judge and questioning why the detention issue could not have been heard more promptly.

50. Thus, before any district judge had independently found Plaintiff dangerous, the United States had already succeeded in depriving him of his liberty through emergency *ex parte* proceedings, notwithstanding the Bail Reform Act's requirement of prompt review and the constitutional requirement that preventive detention rest upon an individualized finding of dangerousness.

51. Thereafter, the United States District Court for the District of Columbia ordered Plaintiff detained pending trial based largely upon the unprecedented events of January 6, 2021, characterizing Plaintiff as a continuing danger to the community despite the absence of evidence demonstrating that Plaintiff posed an individualized and unmitigable future danger.

52. Plaintiff had voluntarily surrendered to federal authorities after learning of the investigation, voluntarily provided investigators with his cellular telephone containing recordings of his own conduct, maintained longstanding family and community ties, and had no history of violent criminal conduct. Nevertheless, and despite possessing this evidence, Defendants urged

the Court to treat Plaintiff as uniquely dangerous based primarily upon the symbolic significance of January 6 itself rather than any individualized assessment of Plaintiff's future conduct.

53. Plaintiff appealed the detention order.

54. On March 26, 2021, the United States Court of Appeals for the District of Columbia Circuit remanded the detention order for reconsideration, holding that the district court had not adequately identified an articulable threat that Plaintiff would pose if released. The Court of Appeals held that the detention analysis employed below failed to apply the individualized inquiry required by the Bail Reform Act and emphasized that detention cannot be justified merely because a defendant participated in the events of January 6. Rather, the relevant inquiry is whether a defendant presently poses an identified and articulable threat of future dangerousness if released pending trial.

55. The Court of Appeals further recognized numerous facts demonstrating that Plaintiff’s case differed materially from the generalized portrayal advanced by Defendants. Circuit Judge Katsas, writing separately, observed that Plaintiff entered the Capitol through an open doorway, remained inside for approximately twelve minutes, did not assault any police officers, did not vandalize property, repeatedly discouraged others from damaging property by telling members of the crowd “don't break shit,” “no vandalizing,” and “you break shit, I break you,” voluntarily surrendered after learning of the investigation, voluntarily provided investigators with his cellular telephone, and had already been ordered released under strict conditions by the Tennessee magistrate judge.

56. The Court of Appeals further explained that the Bail Reform Act requires courts to distinguish between individuals who pose a genuine prospective danger and those whose alleged criminal conduct arose from unique historical circumstances unlikely to recur. The Court of

Appeals cautioned that detention cannot rest upon generalized assumptions arising from the events of January 6 but instead requires evidence demonstrating that a particular defendant is likely to engage in future conduct threatening the safety of another person or the community.

57. Judge Katsas's opinion further recognized that Plaintiff's alleged conduct arose from the unique circumstances of January 6 and questioned how Plaintiff could pose the same danger after those specific circumstances had passed, emphasizing that preventive detention requires a present threat of future dangerousness rather than punishment for past conduct.

58. Following remand, rather than attempting to establish that Plaintiff presented the individualized future danger required by the Court of Appeals, the Government abandoned the dangerousness theory upon which Plaintiff's detention had rested. Rather than attempting to satisfy the individualized standard announced by the Court of Appeals, it withdrew its detention request. Plaintiff was then released under stringent conditions and fully complied with every condition imposed by the Court.

59. Defendants nevertheless continued publicly portraying Plaintiff as among the most dangerous January 6 defendants despite the Court of Appeals' rejection of the detention rationale upon which Defendants had successfully sought his incarceration.

60. For the period of his pre-trial detention, Plaintiff was detained at the D.C. Jail.

61. The Deputy Warden of the D.C. Jail was defendant Deputy Warden Landerkin, who was known to have extreme animus toward Trump supporters.

62. This animus was expressed by making the following now-deleted posts on the social media site "X" (formerly known at Twitter):

a. "F--- everyone who supports Trump" (November 24, 2019);

b. "How are we allowing Trump and his lackeys destroy our country?" (November 24, 2019);

c. "About time they stop giving Trumps mouthpieces time to spew their lies" (February 8, 2020);

d. "Trump is doing more damage to this county then foreign terrorists ever have" (September 11, 2020);

e. "… if you are in the crowd behind Trump you are trash. While very animated, you are without conscious, feeling or morals…" (October 13, 2019);

f. "… Republican fascist" (July 27, 2019).[1]

63. Despite this known animus, the United States government, by and through its employees, defendants Marshal Washington and Marshal Dixon, placed Plaintiff in the D.C. Jail for his pre-trial detention.

64. Upon information and belief, Defendants Washington and Dixon were responsible, in whole or in part, for decisions regarding the placement, transfer, housing, and continued detention of federal pretrial detainees, including January 6th Defendants housed at the D.C. Jail.

65. Upon information and belief, Washington and Dixon knew or reasonably should have known that Deputy Warden Landerkin had publicly expressed hostility toward supporters of President Donald J. Trump and individuals associated with the January 6 protests.

66. Upon information and belief, Washington and Dixon received inspection reports, grievances, judicial findings, or other notice concerning the conditions affecting January 6 detainees and nevertheless continued Plaintiff's placement there.

[1] https://x.com/FmrRepMTG/status/1471514473693208582

67. The statements attributed to Deputy Warden Landerkin were publicly available and widely circulated, including through social-media posts and public reporting.

68. Upon information and belief, Washington and Dixon knew or reasonably should have known that the continued placement of January 6 detainees in a facility operated by officials harboring such animus created a substantial risk that those detainees would be subjected to discriminatory treatment, punitive conditions, unequal treatment, retaliation, or other constitutional deprivations.

69. Despite that knowledge, Washington and Dixon continued authorizing, approving, maintaining, or permitting Plaintiff's placement and continued detention at the D.C. Jail.

70. At all relevant times, Plaintiff was presumed innocent and had not been convicted of any offense.

71. During the course of his pre-trial detention, Plaintiff suffered physical and psychological injuries, as will be further described below.

72. During his detention, Plaintiff was housed among a group of detainees commonly referred to by correctional officials, government personnel, media organizations, and the public as "January 6th Detainees."

73. Upon information and belief, January 6th Detainees were subjected to restrictions, conditions, and treatment materially different from those imposed upon similarly situated federal pretrial detainees who were not charged in connection with events occurring on January 6, 2021.

74. Plaintiff and other January 6th Detainees were subjected to prolonged lockdowns, extensive restrictions on movement, recreation, social interaction, and visitation. These restrictions resulted in severe emotional distress, isolation, and deterioration of family relationships.

75. Plaintiff and other January 6th Detainees repeatedly attempted to challenge these conditions through the grievance process. Correctional staff routinely obstructed those efforts by refusing grievance forms, delaying responses, altering submissions, discouraging complaints, and retaliating against detainees who sought administrative review.

76. The conditions imposed upon Plaintiff were not the product of individualized security assessments.

77. Plaintiff did not present a unique institutional threat that justified the restrictive conditions under which he was confined.

78. Defendants nevertheless maintained these restrictions for prolonged periods of time.

79. Upon information and belief, Defendants were aware of widespread complaints concerning the treatment of January 6th Detainees and the conditions under which they were confined.

80. Defendants received grievances, correspondence, reports, complaints, media inquiries, and other information placing them on notice of the conditions described herein.

81. Despite such notice, Defendants failed to take reasonable steps to remedy the unconstitutional conditions imposed upon Plaintiff.

82. The conditions described herein were excessive in relation to any legitimate governmental objective and functioned as punishment of Plaintiff before adjudication of guilt.

## **AS AND FOR A FIRST CAUSE OF ACTION**

*Abuse of Process - FTCA*

83. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

84. This claim is asserted solely against Defendant UNITED STATES OF AMERICA ("United States") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680.

85. The United States employed criminal process against Plaintiff for purposes collateral to the legitimate ends of criminal prosecution.

86. The lawful purposes of arrest, detention, charging, prosecution, and sentencing are to secure a defendant's appearance, protect the public from an individualized and articulable danger, adjudicate guilt, and impose punishment authorized by law.

87. The United States used those processes for different purposes: to punish Plaintiff before trial, to incapacitate him because of his association with January 6, to make him a public example, to deter similarly situated January 6th Defendants, and to advance a broader public narrative that January 6 defendants were categorically dangerous.

88. After a magistrate judge found that Plaintiff was neither a flight risk nor a danger to the community and ordered him released under stringent conditions, the United States sought and obtained an *ex parte* stay that kept Plaintiff incarcerated for weeks without any judicial finding of dangerousness. The Court of Appeals later described that sequence as "troubling."

89. The United States then continued to pursue detention based not on Plaintiff's individualized future dangerousness, but on the symbolic and political meaning Defendants assigned to January 6. The detention process was used to transform Plaintiff from an individual defendant into a representative symbol of an entire disfavored class of political defendants.

90. The misuse of process by the United States was further reflected in its reliance on generalized allegations of insurrection, threat to democracy, and danger to the republic, despite record evidence that Plaintiff voluntarily surrendered, preserved and produced his phone, had no history of violence, did not assault anyone, did not vandalize property, did not search for members of Congress, and did not threaten to use the zip ties he picked up inside the Capitol.

91. The Court of Appeals held that pretrial detention must rest on a specific, forward-looking assessment of whether Plaintiff himself posed an unmitigable danger, not a generalized, backward-looking assessment of January 6 or January 6 defendants as a group.

92. The United States also used the disputed obstruction charges and resulting sentencing exposure to increase pressure on Plaintiff, amplify public condemnation, and justify harsh treatment disproportionate to Plaintiff's actual conduct.

93. Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512 to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

94. The collateral purpose of the United States was not merely to prosecute alleged criminal conduct, but to stigmatize, deter, and punish Plaintiff for his perceived political identity and association with January 6.

95. As a direct and proximate result of Defendant's abuse of process, Plaintiff suffered loss of liberty, emotional distress, reputational harm, economic damages, legal expenses, and other injuries in an amount to be determined at trial.

## **AS AND FOR A SECOND CAUSE OF ACTION**

*Malicious Prosecution - FTCA*

96. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

97. This claim is asserted solely against Defendant UNITED STATES OF AMERICA ("United States") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680.

98. Acting through federal investigative and law-enforcement personnel acting within the scope of their employment, Defendant United States caused criminal proceedings to be initiated and continued against Plaintiff under 18 U.S.C. § 1512(c)(2) and 1512(k) in *United States v. Munchel*, No. 21-cr-118 (D.D.C.).

99. The United States initiated and continued criminal proceedings against Plaintiff without probable cause to believe that Plaintiff had engaged in the criminal conduct Defendant publicly attributed to him.

100. In seeking Plaintiff's indictment, detention, and continued prosecution, Defendant possessed evidence demonstrating that Plaintiff voluntarily surrendered, preserved and produced critical evidence, did not assault law enforcement officers, did not vandalize the Capitol, did not forcibly breach the building, did not search for Members of Congress, and voluntarily departed the Capitol. Nevertheless, Defendants repeatedly portrayed Plaintiff as among the most dangerous participants in the events of January 6.

101. Defendants further pursued felony obstruction charges under an unprecedented and expansive interpretation of 18 U.S.C. § 1512, thereby substantially increasing Plaintiff's potential detention, sentencing exposure, and public stigma. Those convictions were ultimately vacated by the Court of Appeals before all remaining criminal charges were dismissed.

102. The United States continued the prosecution despite possessing evidence materially undermining their characterization of Plaintiff and despite the absence of evidence demonstrating that Plaintiff had engaged in the violent conduct repeatedly attributed to him.

103. The criminal proceedings terminated in Plaintiff's favor when the Court of Appeals vacated Plaintiff's principal felony convictions and the Government thereafter dismissed the remaining charges with prejudice.

104. As a direct and proximate result of malicious prosecution, Plaintiff suffered loss of liberty, emotional distress, reputational injury, financial loss, attorneys' fees, and other damages.

**AS AND FOR A THIRD CAUSE OF ACTION**
*Fifth Amendment Due Process* – Bivens
*Against Matthew Graves and John Doe AUSAs*

105. Plaintiff repeats and realleges the prior allegations as though fully set forth herein.

106. The Fifth Amendment guarantees that no person shall be deprived of liberty without due process of law.

107. The Bail Reform Act permits preventive detention only in carefully limited circumstances. Consistent with the Due Process Clause, the Government may deprive a presumptively innocent person of his liberty before trial only upon demonstrating by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community.

108. Preventive detention is the carefully limited exception—not the rule—for presumptively innocent individuals awaiting trial.

109. Defendants JOHN DOE Assistant United States Attorneys, who actually argued for pretrial detention and obtained the *ex parte* stay, acting under color of federal law and within the scope of their employment, intentionally sought, procured, and prolonged Plaintiff's pretrial detention despite possessing evidence demonstrating that Plaintiff did not present an individualized, identified, and articulable threat to public safety.

110. Prior to Plaintiff's transfer to the District of Columbia, a United States Magistrate Judge conducted a full detention hearing and determined that Plaintiff was neither a flight risk nor a danger to the community. The magistrate judge ordered Plaintiff released subject to stringent conditions, including home detention, GPS monitoring, supervision by Pretrial Services, and restrictions on possessing firearms or dangerous weapons.

111. Rather than permit Plaintiff's release, Defendants immediately sought review of that determination and obtained an *ex parte* stay that prevented Plaintiff's release and caused Plaintiff to remain incarcerated despite the absence of any judicial finding that he posed a danger warranting continued detention. The United States Court of Appeals for the District of Columbia Circuit later described that sequence of events as "troubling."

112. Defendants thereafter urged Plaintiff's continued detention by relying primarily upon generalized assertions concerning the events of January 6 and by portraying Plaintiff as a continuing threat to the Republic, rather than demonstrating that Plaintiff himself posed a concrete and prospective danger that could not be mitigated through conditions of release.

113. The Court of Appeals subsequently held that preventive detention under the Bail Reform Act requires a forward-looking determination that a particular defendant presents an identified and articulable threat to public safety and concluded that the detention analysis employed in Plaintiff's case failed adequately to undertake that individualized inquiry. The Court emphasized that detention cannot rest upon generalized, backward-looking assessments arising from January 6, but instead requires consideration of whether the individual defendant presently poses an unmitigable danger if released.

114. The Court of Appeals further recognized that Plaintiff voluntarily surrendered to federal authorities, preserved evidence, voluntarily provided investigators with his cellular

telephone, had no history of violence, did not assault law enforcement officers, did not vandalize government property, did not forcibly breach Capitol security, did not search for Members of Congress, and voluntarily departed the Capitol. The Court concluded that these individualized facts materially undermined Defendants' theory that Plaintiff presented an unmitigable danger requiring continued detention.

115. Following remand, Plaintiff was released pending trial and successfully remained at liberty under court-imposed conditions for the duration of the criminal proceedings, fully complying with every condition of release.

116. Defendants nevertheless intentionally deprived Plaintiff of his liberty by advocating and maintaining preventive detention unsupported by the individualized showing required by the Due Process Clause and the Bail Reform Act.

117. Defendants' conduct was intentional, willful, malicious, and undertaken with reckless disregard for Plaintiff's constitutional rights.

118. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff was deprived of his liberty, confined in punitive conditions, suffered emotional distress, reputational injury, financial loss, and other damages in an amount to be determined at trial.

**AS AND FOR A FOURTH CAUSE OF ACTION**
*Fifth Amendment Equal Protection* – Bivens
*Federal Individual Defendants*

119. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

120. Defendants Garland and Graves (the "DOJ Defendants") personally participated in, approved, implemented, supervised, ratified, or knowingly permitted Department of Justice policies and practices governing the investigation, charging, detention, prosecution, and sentencing of January 6th Defendants, including Plaintiff.

121. Upon information and belief, those policies included the widespread use of 18 U.S.C. § 1512, aggressive detention positions, enhanced charging decisions, and litigation strategies designed to increase detention exposure, sentencing exposure, prosecutorial leverage, public deterrence, and public example-making in January 6th cases.

122. Upon information and belief, those policies also included seeking preventive detention in cases where individualized evidence did not demonstrate an unmitigable future danger, thereby treating January 6th Defendants more harshly than similarly situated federal criminal defendants charged with comparable or more serious conduct.

123. Plaintiff alleges that the DOJ Defendants intentionally subjected January 6th Defendants, including Plaintiff, to investigative, charging, detention, and prosecutorial practices materially different from those employed against similarly situated criminal defendants because of their actual or perceived political viewpoints, associations, and participation in events occurring on January 6, 2021.

124. Upon information and belief, the DOJ Defendants received regular briefings concerning January 6th investigations and prosecutions, were aware of the policies challenged herein, and knowingly approved, ratified, or permitted their continued implementation.

125. Upon information and belief, Defendants sought pretrial detention of Plaintiff while declining to seek comparable detention in numerous other January 6 prosecutions involving defendants alleged to have engaged in objectively more violent conduct, including defendants accused of assaulting law enforcement officers, forcibly breaching police barricades, breaking Capitol windows, discharging tasers at police officers, and organizing or financing the events of January 6. The United States Court of Appeals for the District of Columbia Circuit specifically acknowledged Plaintiff's argument that the Government had not sought detention in other January

6 cases involving defendants alleged to have engaged in more serious violent conduct, observing that such allegations could bear upon the Government's detention decisions, although it declined to resolve that issue because it had not been fully presented to the district court.

126. Defendants lacked a constitutionally sufficient justification for treating Plaintiff differently from similarly situated defendants. The disparate investigative, charging, detention, and prosecutorial practices imposed upon Plaintiff were not rationally related to any legitimate governmental objective and instead reflected impermissible viewpoint discrimination and selective enforcement directed at January 6 Defendants.

127. The DOJ Defendants' conduct violated the equal protection component of the Fifth Amendment and directly and proximately caused Plaintiff to suffer loss of liberty, emotional distress, reputational injury, economic loss, and other damages.

**AS AND FOR A FIFTH CAUSE OF ACTION**
*42 U.S.C. § 1983*
*Violation of the First and Fifth Amendments*
*Unconstitutional Conditions of Pretrial Confinement*

128. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

129. At all relevant times, Plaintiff was a federal pretrial detainee housed at the D.C. Jail and was presumed innocent of all criminal charges.

130. Defendant Landerkin and the Doe Defendants acted under color of District of Columbia law.

131. The First Amendment protects the rights of individuals to engage in political speech, political association, expressive activity, petitioning activity, and other constitutionally protected conduct free from government retaliation, viewpoint discrimination, or political reprisal.

132. The Due Process Clause of the Fifth Amendment prohibits the punishment of pretrial detainees prior to an adjudication of guilt.

133. Plaintiff was detained solely as a pretrial detainee and remained presumed innocent.

134. Upon information and belief, Defendants viewed Plaintiff and other January 6 detainees with hostility because of their actual or perceived political beliefs, political associations, support for President Donald J. Trump, participation in political demonstrations, and opposition to positions favored by Defendants.

135. Upon information and belief, Defendants intentionally subjected Plaintiff and other January 6 detainees to restrictions, conditions, and treatment materially different from those imposed upon similarly situated pretrial detainees who were not associated with January 6.

136. These restrictions included, but were not limited to, prolonged lockdowns, severe limitations on movement, recreation, visitation, communication, social interaction, and access to ordinary privileges afforded to other detainees.

137. Plaintiff further attempted to challenge these conditions through available grievance procedures and other complaints. Defendants obstructed, discouraged, ignored, altered, delayed, or retaliated against such efforts.

138. The restrictions imposed upon Plaintiff were not the product of individualized security determinations, disciplinary findings, or legitimate correctional necessities specific to Plaintiff.

139. Rather, upon information and belief, Defendants imposed and maintained these restrictions because of Plaintiff's actual or perceived political beliefs, associations, expressive conduct, protected activity, status as a January 6th Defendant, and/or his attempts to complain about unconstitutional treatment.

140. The conditions imposed upon Plaintiff were excessive in relation to any legitimate governmental objective and were not reasonably related to institutional security, order, or administration.

141. As a result, the conditions functioned as punishment imposed upon Plaintiff before any adjudication of guilt.

142. By intentionally imposing punitive restrictions unrelated to legitimate governmental objectives, Defendants violated Plaintiff's rights under the Due Process Clause of the Fifth Amendment.

143. By imposing adverse treatment because of Plaintiff's actual or perceived political beliefs, political associations, protected expressive activity, status as a January 6 defendant, and/or complaints regarding jail conditions, Defendants violated Plaintiff's rights under the First Amendment.

144. Defendants acted intentionally, willfully, maliciously, recklessly, and with deliberate indifference to Plaintiff's constitutional rights.

145. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of liberty, emotional distress, humiliation, anxiety, psychological injury, pain and suffering, damage to reputation, and other economic and non-economic damages.

## **AS AND FOR A SIXTH CAUSE OF ACTION**

*Fifth Amendment Due Process* – Bivens
*Deliberate Indifference to Known Risk of Punitive and Discriminatory Confinement*
*Against Defendants Donald W. Washington and Robert Anthony Dixon*

146. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

147. At all relevant times, Washington and Dixon exercised authority over the placement, transfer, housing, and continued detention of federal pretrial detainees, including Plaintiff and other January 6th Detainees.

148. Upon information and belief, Washington and Dixon knew or reasonably should have known that Deputy Warden Kathleen Landerkin had publicly expressed hostility toward supporters of President Donald J. Trump and individuals associated with January 6, 2021.

149. Upon information and belief, Washington and Dixon further knew or reasonably should have known that placing January 6th Detainees in a facility operated by officials harboring such animus created a substantial risk that those detainees would be subjected to discriminatory treatment, punitive confinement conditions, retaliation, unequal treatment, and other constitutional deprivations.

150. Washington and Dixon received grievances, complaints, correspondence, reports, judicial findings, media coverage, and other information concerning the treatment of January 6th Detainees housed at the D.C. Jail and were therefore on notice of the risks described herein.

151. Despite such notice, Washington and Dixon continued authorizing, approving, maintaining, or permitting Plaintiff's placement and continued detention at the D.C. Jail.

152. Washington and Dixon failed to take reasonable measures to protect Plaintiff from foreseeable constitutional injuries arising from the conditions of confinement and discriminatory treatment described herein.

153. Their actions and omissions were intentional, reckless, malicious, or undertaken with deliberate indifference to Plaintiff's constitutional rights.

154. As a direct and proximate result of the foregoing, Plaintiff suffered loss of liberty, emotional distress, physical injury, reputational harm, and economic damages.

## **AS AND FOR A SEVENTH CAUSE OF ACTION**

*Negligence – FTCA*
*Defendant United States of America*

155. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

156. This cause of action is asserted solely against Defendant United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680.

157. At all relevant times, employees, agents, officers, and servants of the Federal Bureau of Prisons and the United States Department of Justice were acting within the scope of their employment.

158. Defendant United States, through its employees and agents, owed Plaintiff a duty to exercise reasonable care for his safety, health, custody, property, and well-being while he was confined in federal custody.

159. Defendant United States further owed Plaintiff a duty to maintain reasonably safe and sanitary conditions of confinement, to protect Plaintiff from foreseeable harm, to properly administer inmate funds and property, and to comply with applicable policies governing inmate health, safety, sanitation, and institutional operations.

160. During Plaintiff's confinement at FCI Yazoo, Defendant United States, through its employees and agents, failed to exercise reasonable care in the operation, maintenance, supervision, and administration of the institution.

161. Among other things, Defendant United States permitted Plaintiff to be housed in conditions that were unsanitary, unhealthy, unsafe, and unreasonably hazardous.

162. Upon information and belief, those conditions included the presence of mold, inadequate sanitation, inadequate maintenance of living areas, exposure to environmental hazards, and other conditions creating unreasonable risks to inmate health and safety.

163. Plaintiff repeatedly complained of such conditions through institutional channels, grievances, requests, and communications with prison staff.

164. Despite actual or constructive notice of those conditions, Defendant United States failed to take reasonable measures to correct, remediate, investigate, or otherwise address the hazards to which Plaintiff was exposed.

165. Defendant United States further failed to properly provide and administer necessary and prescribed medication to Plaintiff, specifically medication that Plaintiff required to control his blood pressure.

166. Defendant United States further failed to properly supervise, train, monitor, and manage employees responsible for Plaintiff's confinement and care.

167. The acts and omissions described herein constituted negligence under the law of the jurisdiction in which the conduct occurred.

168. As a direct and proximate result of Defendant United States' negligence, Plaintiff suffered physical injury, emotional distress, pain and suffering, loss of property, economic damages, loss of enjoyment of life, and other compensable injuries.

169. Plaintiff has satisfied all jurisdictional prerequisites required under the Federal Tort Claims Act, including presentment and exhaustion, or is otherwise deemed to have constructively exhausted such remedies pursuant to law.

**AS AND FOR A EIGHTH CAUSE OF ACTION**
*Intentional Infliction of Emotional Distress - FTCA*

170. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

171. Defendant the U.S. Government, by and through its employees and agents, engaged in extreme and outrageous conduct, including portraying Plaintiff as a violent criminal, overcharging Plaintiff under expansive statutory theories, and unlawfully and unconstitutionally detaining Plaintiff in pretrial detention.

172. Defendant the United States, by and through its employees and agents, acted intentionally or with reckless disregard of the high probability that their conduct would cause severe emotional distress.

173. Defendant's conduct included obtaining an *ex parte* stay after a federal magistrate ordered Plaintiff released, prolonging Plaintiff's incarceration, publicly portraying Plaintiff as among the most dangerous January 6 defendants despite contrary evidence, prosecuting Plaintiff under an expansive obstruction theory later rejected, and confining Plaintiff in prolonged solitary conditions while presumed innocent.

174. The afore-described conduct was the proximate cause of Plaintiff's injuries.

175. As a result of the afore-described conduct, Plaintiff suffered severe emotional distress, including anxiety, trauma, humiliation, sleep disturbance, and fear of permanent disability or death.

**WHEREFORE**, and for the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in the Plaintiff's favor,

a. Awarding compensatory damages to the Plaintiff, plus post-judgment interest;

b. Awarding punitive damages to the Plaintiff;

c. Awarding Plaintiff reasonable costs, disbursements, and attorney's fees; and

d. Awarding any such other and further relief as this Court finds is required in the interest of justice.

Dated: September 15, 2026
New York, New York

Respectfully submitted,

/s/*Alexander Lonstein*
Alexander Lonstein
**RAISER, KENNIFF & LONSTEIN, P.C.**

99 Park Avenue, Suite 1530
New York, NY 10016
alexander@rkl.law